# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF MINNESOTA

United States of America ex rel. Pamela
Lorraine Watson, and Pamela Lorraine
Watson, individually,

       Plaintiffs,

vs.

Arlyn Christ, Helen Christ, Kevin Christ,
and Deeann Christ

       Defendants.

SCANNED

AUG 1 4 2013

U.S. DISTRICT COURT MPLS

**COMPLAINT**

**Civil Action No.** 13sc2200 MJ0/ASB

## INTRODUCTION

1.  Qui tam Plaintiff, Pamela Lorraine Watson ("Ms. Watson"), brings this action under the False Claims Act ("FCA"), the Minnesota Human Rights Act ("MHRA"), the Minnesota Landlord-Tenant Statute, and the Minnesota Uniform Deceptive Trade Practices Act. There are six independent claims. First, Defendants intentionally violated the FCA when they knowingly made fraudulent claims to the Minneapolis Public Housing Authority ("MPHA") in order to receive payments through the federally-funded Section 8 Housing Choice Voucher Program.

2.  Defendants directly violated the MHRA, which protects Ms. Watson from discrimination on the basis of her receipt of public assistance, when they required her to pay "side payments" exceeding the Section 8 Housing Assistance Payments Contract

("HAP Contract") amount and retaliated against her when she refused to pay the illegal "side payments."

3.      Defendants      directly      violated      the      Minnesota      Landlord-Tenant Statute when they billed Ms. Watson illegally for apportioned reimbursement for utilities and water.

4.      Defendants directly violated the Minnesota Landlord-Tenant Statute when they made Ms. Watson responsible for lawn care, snow and ice removal, and rodent and pest control. Defendants transferred their unwaivable obligations under the covenants of habitability by making Ms. Watson responsible for this maintenance.

5.      Defendants      directly      violated      the      Minnesota      Landlord-Tenant Statute by keeping Ms. Watson's security deposit and charging her additional amounts of money unjustly and in bad faith.

6.      Defendants directly violated the Minnesota Uniform Deceptive Trade Practices Act by not showing Ms. Watson an addendum to the parties' lease and by including and enforcing provisions in the addendum that violated the Minnesota Landlord-Tenant Statute.

## JURISDICTION

7.      This action is brought under the False Claims Act, 31 U.S.C. § 3729 (2013).  This Court has jurisdiction over the federal statutory claim pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 (2013).

8.      This action is also brought under the Minnesota Human Rights Act, Minnesota Statutes §§ 363A.09 and 363A.15 (2012), the Minnesota Uniform Declaratory

Judgments Act, Minnesota Statutes § 555.01-.04 (2012), Minnesota Landlord-Tenant law, Minnesota Statutes §§ 504B.161, 504B.215 and 504B.178 (2012), and the Minnesota Uniform Deceptive Trade Practices Act, Minnesota Statutes § 352D.43-.48 (2012). This Court has supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 (2013).

## VENUE

9.     The Defendants reside in or conduct business in Minnesota and the facts alleged occurred exclusively in Minnesota.  Accordingly, this claim is properly venued in the District of Minnesota pursuant to 28 U.S.C. § 1391 (2013).

## THE PARTIES AND THE PROPERTY AT ISSUE

10.    Plaintiff United States of America is ex rel. Pamela Lorraine Watson.

11.    Ms. Watson is a former tenant at 4322 Fremont Avenue North, Apartment #2, Minneapolis, MN 55412.

12.    At all times at issue in this case, Ms. Watson received public assistance in the form of rental assistance provided through a Section 8 Housing Choice Voucher.

13.    Defendants Arlyn Christ and Helen Christ own the property at 4322 Fremont Avenue North in Minneapolis, Minnesota ("the Fremont premises"), a duplex that is not owner occupied.

14.    At all times at issue in this case, Defendant Kevin Christ was an agent of Defendants Arlyn Christ and Helen Christ.

15.    At all times at issue in this case, Defendant Deeann Christ was an agent of Defendants Arlyn Christ and Helen Christ.

3

## THE SECTION 8 HOUSING CHOICE VOUCHER PROGRAM

16.     The Section 8 Housing Choice Voucher Program, more commonly referred to as "Section 8," is funded through the U.S. Department of Housing and Urban Development ("HUD") and is locally administered, in this case by the Minneapolis Public Housing Authority ("MPHA").

17.     Pursuant to an annual contribution contract, HUD provides federal funds that the MPHA disburses directly to owners as the rent subsidy for eligible participants in its Section 8 Housing Choice Voucher Program.  42 U.S.C. § 1437f (b)(1) (2013).

18.     The MPHA and the owner enter a HAP Contract that establishes the rental amount for the unit, Contract Rent; the amount the MPHA will pay the owner, HAP Amount; and the amount the tenant will pay the owner, Tenant Amount.

19.     The HAP Contract contains three parts. Part A of the HAP Contract contains the basic information about the tenancy including the name of the tenant, the address of the contract unit, the names of all household members, the first and last date of the initial lease term, the Contract Rent, the HAP Amount, the Tenant Amount, the utilities and appliances that will be provided and paid for by the owner, the utilities and appliances that will be provided and paid for by the tenant, and the signatures of a MPHA representative and the owner. Part B of the HAP Contract is the body of the contract. It describes in detail the program requirements affecting the owner and the owner's rights and responsibilities under the Section 8 Housing Choice Voucher Program. Part C of the HAP Contract contains the Tenancy Addendum. The Tenancy Addendum sets forth the tenancy requirements for the program and the composition of the household, as approved

by the MPHA. The owner must sign the Tenancy Addendum with the prospective tenant, and the tenant has the right to enforce the Tenancy Addendum against the owner. The terms of the Tenancy Addendum prevail over any other provisions of the lease.

20.   The amount of rent subsidy, the HAP Amount, paid to the owner through the Section 8 Housing Choice Voucher Program is calculated pursuant to a payment standard set by the MPHA at levels between 90% to 110% of the rental price of modestly priced apartments in the local market.  42 U.S.C. § 1437f (c) (2013).

21.   A tenant in the Section 8 Housing Choice Voucher Program pays at least 30% of their adjusted monthly income for rent as the Tenant Amount. 42 U.S.C. § 1437a (a) (2013). The tenant's payments may, or may not, include utilities depending on the contract between the tenant, the owner and the MPHA.

## FACTS

### Ms. Watson's Tenancy At 4322 Fremont Avenue North

22.   In July of 2010, Ms. Watson was living in Brooklyn Park, Minnesota. She received rental assistance in the form of a Section 8 Housing Choice Voucher administered by the Metropolitan Housing and Redevelopment Authority ("Metro HRA") during her tenancy in Brooklyn Park.

23.   Ms. Watson's lease at her apartment in Brooklyn Park was set to expire on August 31, 2010.

24.   In early August of 2010, Ms. Watson located the Fremont premises while out driving with her mother. Ms. Watson and her mother saw a "For Rent" sign in the

front yard of the Fremont premises. Defendant Kevin Christ was sitting on the front steps of the Fremont premises.

25.     Ms. Watson and her mother toured the Fremont premises with Defendant Kevin Christ on the same day that she saw the "For Rent" sign in the front yard.

26.     When Ms. Watson toured the Fremont premises Defendant Kevin Christ told Ms. Watson that he owned the Fremont premises.

27.     When Ms. Watson toured the Fremont premises the unit was occupied by other tenants.

28.     On the same day that she toured the Fremont premises Ms. Watson paid a $25 application fee to Defendant Kevin Christ.

29.     Approximately two days after touring the Fremont premises, Defendant Kevin Christ called Ms. Watson and offered to rent to her the Fremont premises.

30.     On August 8, 2010, Defendant Kevin Christ signed a shelter verification form to be included in Ms. Watson's application for Emergency Assistance from Hennepin County. On this form Defendant Kevin Christ listed Ms. Watson's rent as $1023. Ex. 1.

31.     On August 9, 2010, Ms. Watson and Defendant Kevin Christ signed a two page lease for the Fremont premises. This lease states the "Monthly Apartment Rent" as $988, "Other Monthly Rent Charges" as $35 for laundry, and "Total Monthly Rent" as $1023. Ex. 2, at 1.

32.     On August 9, 2010, Ms. Watson and Defendant Kevin Christ signed the Section 8 Request for Tenancy Approval ("RTA"). The RTA is a required HUD form

that owners participating in the Section 8 program fill out with information about the unit regarding unit size, rent, address, and utility responsibilities. The monthly rent amount listed on the RTA is $1,023. Ex. 4.

33.     On August 9, 2010, Defendant Kevin Christ faxed a copy of the two page lease and RTA he and Ms. Watson signed to Metro HRA. Included in the materials faxed by Defendant Kevin Christ to Metro HRA was a three page, 11 paragraph "Addenda to Lease." Ex. 3.

34.     Defendants never presented Ms. Watson with the "Addenda to Lease."

35.     Defendants never told Ms. Watson about the existence of, or the contents of the "Addenda to Lease."

36.     Throughout the term of Ms. Watson's tenancy at the Fremont premises, Defendant Kevin Christ told her that she was responsible for snow and ice removal from the sidewalks and stairs of the property, lawn care, and pest control.

37.     On August 10, 2010, Ms. Watson submitted an application for Emergency Assistance through Hennepin County to pay the damage deposit for the Fremont premises.

38.     In mid-August of 2010, Metro HRA prepared papers to transfer administration of Ms. Watson's Section 8 Housing Choice Voucher to the MPHA beginning September 2010.

39.     The "Addenda to Lease" was not provided to the MPHA for approval as part of the RTA.

7

40.     The "Addenda to Lease" is not part of the MPHA's file for Ms. Watson's Section 8 Housing Choice Voucher Program participation.

41.     The MPHA inspected the Fremont premises on September 3, 2010.

42.     Ms. Watson and her disabled minor son moved into the Fremont premises on September 15, 2010.

43.     On September 16, 2010, Hennepin County paid Defendant Arlyn Christ Emergency Assistance funds in the amount of $988 for Ms. Watson's damage deposit for the Fremont premises. Ex. 5.

44.     On September 22, 2010, Ms. Watson received a payment invoice from Defendant Kevin Christ listing the total rent due for October as $1023. Ex. 6.

45.     On December 7, 2010, Defendant Kevin Christ signed the HAP Contract listing himself as the owner of the Fremont premises. Ex. 7, at 2.

46.     A MPHA Section 8 Administrator signed the HAP contract for the Fremont premises on December 13, 2010. Ex. 7, at 2.

47.     The HAP Contract states the Contract Rent for the Fremont premises was $988 per month. The HAP Contract states Ms. Watson's portion of the rent, the Tenant Amount, as $190 per month. The HAP Contract states MPHA's HAP payment to owner as $798 per month. Ex. 7, at 1.

48.     The HAP Contract Rent does not include a $35 laundry charge or any additional amount as "Other." Ex. 7.

49.     The HAP Contract states that the owner is responsible for providing and paying for all utilities and water. Ex. 7, at 2.

50.     In Part B, Section 8.d. of the HAP Contract, Defendants certified that "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration . . . from the family . . . for rental of the contract unit during the HAP Contract term." Ex. 7, at 5.

51.     In Part B, Section 7.b. of the HAP Contract, Defendants agreed that "[u]nless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP Contract." Ex. 7, at 4.

52.     In Part C, Section 5.e. of the HAP Contract, Defendants agreed to "not charge or accept from the family or from any other source, any payment for rent of the unit in addition to the rent to owner." Ex. 7, at 8.

53.     In Part B, Section 5.c. of the HAP Contract, Defendants agreed that "the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant." Ex. 7, at 4.

54.     In Part B, Section 5.c. of the HAP Contract, Defendants agreed that, with regards to payments for utilities and appliances, "the lease shall be consistent with the HAP contract." Ex. 7, at 4.

55.     In Part C, Section 5.f. of the HAP Contract, Defendants agreed to "immediately return any excess rent payment to the tenant." Ex. 7, at 8.

56.     In Part C, Section 12.c. of the HAP Contract, Defendants agreed to "promptly refund the full amount of the unused balance [of the security deposit] to the tenant." Ex. 7, at 10.

9

57.     In Part C, Section 2.a. of the HAP Contract, Defendants agreed that "the owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant." Ex. 7, at 8.

58.     In Part C, Section 2.a. of the HAP Contract, Defendants certified that "the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum." Ex 7, at 8.

59.     Prior to the beginning of their tenancy with Ms. Watson, Defendants had participated in the Section 8 Housing Choice Voucher Program as owners in other tenancies.

60.     Despite signing the HAP Contract, which states that the rent for the Fremont premises was $988 and that no additional payment for rent would be sought or received from Ms. Watson, Defendants demanded that Ms. Watson pay additional monthly amounts.

61.     Defendants demanded $35 a month from Ms. Watson for "laundry charges." Ms. Watson was not required to pay Defendants laundry charges under the terms of the HAP Contract. Exs. 7 & 8.

62.     On January 10, 2011, Defendant Kevin Christ sent a payment invoice to Ms. Watson demanding that she pay for "excessive electrical usage" in the amount of $39 and "excessive water usage" in the amount of $18.75. These amounts were demanded to be paid by February 1, 2011. Ex. 8.

63.     On February 11, 2011, Defendant Kevin Christ sent a payment invoice to

Ms. Watson demanding that she pay for "excessive water usage" in the amount of $25.

This amount was demanded to be paid by March 1, 2011. Ex. 9.

64.     On the February 11, 2011, payment invoice Defendant Kevin Christ stated

that the payment that Ms. Watson made on February 1, 2011 was applied to, amongst

other things, "past due laundry charges" and "utilities." Ex. 9.

65.     Throughout the term of Ms. Watson's tenancy at the Fremont premises, the

premises always had a single utility meter for water, gas, and electricity.

66.     Although the HAP Contract stated that the owner was responsible for all

utilities and water, Defendants billed Ms. Watson for apportioned reimbursement for

utility usage throughout the term of her tenancy at the Fremont premises.

67.     Throughout the term of Ms. Watson's tenancy at the Fremont premises she

never saw a utility bill.

68.     On March 9, 2011, Ms. Watson informed MPHA Section 8 that Defendant

Kevin Christ was threatening to evict her for alleged unpaid rent in the amount of $200

per month for the months of September 2010 to March 2011. Ex. 10.

69.     Ms. Watson told MPHA Section 8 that she had paid $190 in rent each

month to Defendant Kevin Christ, and that she had receipts for all of her payments.

MPHA Section 8 told Ms. Watson that her portion of the rent was $190. Ex. 10.

70.     On April 19, 2011, Defendant Kevin Christ filed an eviction action against

Ms. Watson in Hennepin County Housing Court. *Kevin Christ v. Pamela Watson*. No. 27-

CV-HC-11-2511 (Minn. Dist. Ct. 4th Dist. Apr. 19, 2011). In the Complaint, Defendant

11

Kevin Christ states that the rent payable under the terms of the parties' lease is $1023 due on the first day of each month. In the Complaint, Defendant Kevin Christ also states that the eviction is for non-payment of rent and late fees from January 2011 to March 2011 in the amount of $710.90. Ex. 11.

71.     On May 2, 2011, Ms. Watson and Defendant Kevin Christ attended the eviction hearing at Hennepin County Housing Court. Both parties appeared pro se.

72.     To avoid homelessness for herself and her disabled minor child and to keep her Section 8 Housing Choice Voucher, Ms. Watson executed a Settlement Agreement with Defendant Kevin Christ using a form provided by Housing Court.

73.     The Settlement Agreement required Ms. Watson to pay Defendant Kevin Christ $475 each month from June 2011 to September 2011. These payments were due on the fifth of each month. The Settlement Agreement also required Ms. Watson to pay Defendant Kevin Christ $307 on October 5, 2011 after her lease for the Fremont premises was set to end. Ex. 12.

74.     Under the terms of the Settlement Agreement, Defendant Kevin Christ required Ms. Watson to pay $285 in excess of her Section 8 rent of $190 for June through September of 2011.

75.     Ms. Watson did not believe that she owed the money demanded in the Settlement Agreement.

76.     Ms. Watson signed the Settlement Agreement because she did not have alternative housing for her and her disabled minor son.

12

77. Ms. Watson also signed the Settlement Agreement because she feared that being evicted would put her Section 8 Housing Choice Voucher in jeopardy of being terminated.

78. Ms. Watson's only source of income during this time period was her disabled minor son's SSI benefit. When she signed the Settlement Agreement she knew that it would be a significant financial burden to comply with the payment plan.

79. On September 12, 2011, Defendant Kevin Christ obtained a Writ of Recovery from Hennepin County Housing Court for the Fremont premises by stating in an affidavit filed with Housing Court that Ms. Watson breached the terms of the Settlement Agreement by failing to pay him $475 on September 5, 2011. Exs. 13 & 14.

80. On September 20, 2011, Defendant Kevin Christ and the Hennepin County Sheriff executed the Writ of Recovery.

81. Ms. Watson and her disabled minor son vacated the Fremont premises on September 20, 2011.

82. At the time of the execution of the Writ, while the Sherriff was removing the family from the premises, Defendant Kevin Christ allowed Ms. Watson to store two twin-sized box springs, a candlestick table, and a wooden desk in the basement of the Fremont premises. Defendant Kevin Christ told Ms. Watson that she could retrieve her belongings from the basement when she obtained new housing and when she arranged transportation for the property.

83. Defendant Kevin Christ helped Ms. Watson move her property from her unit into the basement of the Fremont premises for storage free of charge.

13

84.     When Ms. Watson vacated the Fremont premises on September 20, 2011, Defendant Kevin Christ and Ms. Watson did not do a walk-through of Ms. Watson's unit to inspect for damage.

85.     When Ms. Watson vacated the Fremont premises on September 20, 2011, Defendant Kevin Christ did not tell her that she caused any damage to her unit.

86.     On September 20, 2011, Ms. Watson gave Defendant Kevin Christ her fiancé's address and instructed Defendant Kevin Christ to send her $988 damage deposit to her fiancé's address.

87.     On September 28, 2011, Defendant Kevin Christ told the MPHA that Ms. Watson honored the terms of the Settlement Agreement by paying him $475 on June 1, 2011 and $475 on July 1, 2011. Ex. 15.

88.     On September 28, 2011, Defendant Kevin Christ also told the MPHA that Ms. Watson breached the terms of the Settlement Agreement by paying him $450 in August of 2011 and $250 in September of 2011. Ex. 15.

89.     In early October of 2011, Ms. Watson received an "Itemized Distribution" regarding her request for the return of her security deposit from Defendant Kevin Christ. The "Itemized Distribution" is dated October 4, 2011. Defendant Kevin Christ's accounting of Ms. Watson's security deposit demanded payment of past due rent, late fees, sheriff fees, and the cost of the Writ of Recovery in the amount of $1087.90; payment for move out and cleaning costs in the amount of $687.50; and payment for itemized damages in the amount of $197. The "Itemized Distribution" demanded Ms. Watson pay Defendant Kevin Christ a total sum of $1972.40. Ex. 16.

14

### Federal False Claims Act

90.     The False Claims Act states that it is a violation for any person to "knowingly present . . . a false or fraudulent claim for payment or approval" to the United States. 31 U.S.C. § 3729 (a)(1)(A) (2013).

91.     It is also a violation of the FCA to knowingly make or use a false record or statement "material to a false or fraudulent claim." 31 U.S.C. § 3729 (a)(1)(B) (2013).

92.     The FCA defines a "claim" as "any request or demand . . . for money or property that is made to a contractor, grantee, or other recipient . . . if the United States Government provides or has provided any portion of the money or property requested or demanded, or will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2) (2013).

93.     For each violation of the FCA, the violating party is liable for a civil penalty of not less than $5,500 and not more than $11,000 per instance. 31 U.S.C. § 3729(a)(1) (2013); 28 C.F.R. § 85.3 (2013).

94.      In addition, for each violation of the FCA the violator is liable for three times the amount of damages sustained by the United States. 31 U.S.C. § 3729(a)(1) (2013); 28 C.F.R. § 85.3 (2013).

95.     Any person who violates the FCA is liable for the costs of the civil action brought to recover such penalty or damages, including reasonable attorneys' fees. 31 U.S.C. § 3729(a)(3) (2013).

**Applicable Minnesota Human Rights Law**

96.    The Minnesota Human Rights Act states that it is an unfair discriminatory practice for any person having the right to rent or lease any real property to discriminate in terms and conditions or privileges because of a person's status with regard to public assistance. MINN. STAT. § 363A.09, subdivs. 1(a), (b) (2012).

97.    Status with regard to public assistance means the condition of being a recipient of federal, state or local assistance, including being a tenant receiving federal, state or local subsidies in the form of rental assistance or rent supplements. MINN. STAT. § 363A.03, subdiv. 47 (2012).

98.    The MHRA also states that it is a violation for any "owner, lessor…or managing agent of any real property … to intentionally engage in any reprisal against any person because that person …opposed a practice forbidden under [the Minnesota Human Rights Act]." MINN. STAT. § 363A.15 (2012).

99.    Finally, it is a violation of the MHRA to "coerce, intimidate, threaten or interfere with a person" exercising or enjoying their rights under the Act. MINN. STAT. § 363A.09, subdiv. 6 (2012).

**Applicable Minnesota Landlord-Tenant Law**

100.    MINN. STAT. § 504B.161 prescribes covenants for every lease in Minnesota. The landlord in every lease covenants that the premises and all common areas are "fit for the use intended" and to "keep the premises in reasonable repair" during the term of the lease. MINN. STAT. § 504B.161, subdivs. 1, (a)(1) & (2) (2012).

101.    Minnesota Statute § 504B.161 specifically provides that the parties to the lease may not waive or modify the covenants. MINN. STAT. § 504B.161, subdiv. 1(b) (2012).

102.    The landlord and tenant may agree that the tenant will perform specific repairs or maintenance only if the agreement is supported by adequate consideration set forth in a conspicuous writing. MINN. STAT. § 504B.161, subdiv. 2. (2012).

103.    Landlords may withhold a security deposit for unpaid rent or other lawful monies due to the landlord or if there is damage to the property beyond ordinary wear and tear. MINN. STAT. § 504B.178, subdiv. 3 (2012).

104.    If the landlord withholds the security deposit in bad faith, the landlord is liable for punitive damages not to exceed $500 in addition to the damages. MINN. STAT. § 504B.178, subdiv. 7 (2012).

105.    Minnesota Landlord-Tenant law requires a landlord of a single metered residential building that bills for utility charges separate from rent to: (1) provide prospective tenants notice of the total utility cost for the building for each month of the most recent calendar year; (2) predetermine and put in writing an equitable method of apportionment and the frequency of billing; (3) include a provision in the lease, that upon tenants' request, the landlord must provide tenants a copy of all current and past utility bills for all periods of the tenancy for which a tenant received an apportioned utility bill; and (4) inform tenants in writing of the possible availability of energy assistance from the Low Income Home Energy Assistance Program. MINN. STAT. § 504B.215, subdiv. 2a (2012).

106.   If a landlord fails to comply with MINN. STAT. § 504B.215, subdiv. 2a they are subject to penalties proscribed by MINN. STAT. § 504B.221. A landlord who violates MINN. STAT § 504B.215, subdiv. 2a is liable to a tenant for treble damages or $500, whichever is greater, and reasonable attorney's fees. MINN. STAT. §§ 504B.215, subdivs. 2 & 2a, and 504B.221 (2012).

### Minnesota Deceptive Trade Practices Act

107.   The Minnesota Uniform Deceptive Trade Practices Act states that "A person engages in a deceptive trade practice when, in the course of business, vocation or occupation, the person:"… "uses deceptive representations… in connection with goods and services" and "engages in any other conduct which similarly creates a likelihood of confusion of misunderstanding." MINN. STAT. § 325D.44, subdiv. 1 (2012).

108.   In order to prevail in an action brought under the Minnesota Uniform Deceptive Trade Practices Act, the complainant need not prove actual confusion or misunderstanding. MINN. STAT. § 325D.44, subdiv. 2 (2012).

109.   The prevailing party in a suit brought under the Minnesota Uniform Deceptive Trade Practices Act is entitled to injunctive relief, costs, and attorney's fees. MINN. STAT. § 325D.45, subivs. 1 & 2 (2012).

### First Cause of Action: False Claims Act, 31 U.S.C. § 3729

110.   Paragraphs 1 through 89 are incorporated herein by this reference.

111.   Defendants knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by officials of the United States Government, in violation of 31 U.S.C. § 3729(a)(2) (2013).

112.   For each of the 13 months between September 2010 and October 2011, Defendants requested and received a HAP payment of $798 per month as Rent to Owner from the MPHA in conjunction with its federally-funded Section 8 Housing Choice Voucher Program pursuant to the HAP Contract. Ex. 7.

113.   Each time Defendants requested payment they agreed to abide by the HAP Contract that Defendant Kevin Christ signed with the MPHA on December 7, 2010. Ex. 7.

114.   Defendants demanded illegal side payments from Ms. Watson from the beginning of her tenancy. Each time Defendants requested payment from the MPHA they knowingly made a false claim or representation against the United States.

115.   Defendants requested payment of $798 for each of 13 separate months, so they violated the False Claims Act on 13 separate occasions.

116.   The United States of America suffered damages as a result of the Defendants' 13 violations of the False Claims Act because HUD disbursed funds to the MPHA for payment to Defendants pursuant to the Section 8 Housing Choice Voucher Program HAP Contract on behalf of Ms. Watson that would not have been disbursed absent Defendants' false claims and misrepresentations.

### Second Cause of Action:  Reprisal and Interference, MINN. STAT. § 363A.09, subdivs. 1 (a) and (b) and 6 and MINN. STAT. § 363A.15

117.   Paragraphs 1 through 89 are incorporated herein by this reference.

118.   Defendants entered into a HAP Contract with the MPHA for the tenancy of Ms. Watson agreeing to accept only $988 a month for total Contract Rent for rental of the

Fremont premises.

119.  Despite signing the HAP Contract, Defendants demanded that Ms. Watson pay amounts above the tenant rental amount in the HAP Contract.

120.  But for the fact of Ms. Watson receiving public assistance in the form of a Section 8 Housing Choice Voucher, Defendants would not have demanded additional payment requirements.

121.  But for her refusal to pay these illegal side payments, Ms. Watson would not have been evicted for non-payment of rent by Defendants.

122.  But for her refusal to pay these illegal side payments, Defendants would not have refused to refund Ms. Watson's security deposit.

123.  Ms. Watson paid her Total Tenant Amount of the rent while living at the Fremont premises. Accordingly, she does not owe Defendants $1087.90 for "past due rent, late fee, writ of recovery, and sheriff fee to evict." Ex. 16.

124.  Ms. Watson did not damage the front screen, the window handle, or the stove at the Fremont premises. Therefore, she does not owe Defendants $137 for this damage. Ex. 16.

125.  Ms. Watson left the Fremont premises clean. Therefore, she does not owe Defendants $150 for cleaning charges. Ex. 16.

126.  Ms. Watson and Defendant Kevin Christ agreed on September 20, 2010 that Ms. Watson could store some of her belongings in the basement of the Fremont premises without charge until she obtained new housing and arranged for transportation of the stored property. Defendant Kevin Christ helped move Ms. Watson's furniture to

the basement without charge. If Ms. Watson had known that Defendant Kevin Christ would charge her for his assistance she would have refused his offer. Therefore, Ms. Watson does not owe the Defendants $337.50 for the moving and storage of her property. Ex. 16.

127.    Defendants engaged in reprisal against Ms. Watson for her refusal to pay illegal side payments when they retained Ms. Watson's security deposit and billed Ms. Watson for baseless charges for damage to the Fremont premises, moving and storage of her property in the basement of the Fremont premises, past due rent, and other costs associated with her eviction from the Fremont premises.

128.    Defendants' retention of Ms. Watson's security deposit and Defendants' assessment of baseless charges to Ms. Watson were retaliatory and therefore in violation of MINN. STAT. §§ 363A. 09, subdiv. 6 and 363A.15 (2012).

### Third Cause of Action:  Bad Faith Retention of Security Deposit, MINN. STAT. § 504B.178

129.    Paragraphs 1 through 89 are incorporated herein by this reference.

130.    Paragraphs 118 through 128 are incorporated herein by reference.

131.    Defendants violated Minnesota Landlord-Tenant law when they refused to return Ms. Watson's security deposit.

132.    Defendants withheld Ms. Watson's security deposit in knowing violation of the statute.

133.    Defendants withheld Ms. Watson's security deposit in bad faith in violation of MINN. STAT. § 504B.178.

**Fourth Cause of Action: Violation of Covenants of Habitability,**
**MINN. STAT. § 504B.161.**

134. Paragraphs 1 through 89 are incorporated herein by this reference.

135. The covenants of habitability in Minnesota Landlord-Tenant law require landlords to ensure that the premises and all common areas are "fit for the use intended" and to "keep the premises in reasonable repair" during the term of the lease. MINN. STAT. § 504B.161, subdivs. 1 (a)(1) & (2) (2012).

136. The statutory covenants of habitability may not be waived or modified. MINN. STAT. § 504B.161, subdiv. 1 (b) (2012).

137. The landlord and tenant may agree that the tenant will perform specific repairs or maintenance only if the agreement is supported by adequate consideration set forth in a conspicuous writing. MINN. STAT. § 504B.161, subdiv. 2 (2012).

138. Defendants' "Addenda to Lease" attempts to shift their obligations under the statutory covenants of habitability to Ms. Watson. Ex. 3, at 2, ¶¶ 1 & 2.

139. During her tenancy at the Fremont premises, Ms. Watson was required by Defendants to mow and water the grass and remove snow and ice from the sidewalks and stairs of the property. Ms. Watson was also required by Defendants to exterminate rodents and pests. During her tenancy at the Fremont premises, Ms. Watson spent uncompensated time and her own money to perform Defendants' maintenance obligations.

140. There was no adequate consideration set forth in writing, as required by MINN. STAT. § 504B.161, subdiv. 2 (2012), to support any of Defendants' shifts of their

legal obligations under the covenants of habitability to Ms. Watson.

### Fifth Cause of Action: Violation of the Shared Meter Statute, MINN. STAT. § 504B.215.

141.   Paragraphs 1 through 88 are incorporated herein by this reference.

142.   Defendants violated the Minnesota Landlord-Tenant statute when they billed Ms. Watson for apportioned reimbursement for utilities and water. Exs. 8 & 9.

143.   The Fremont premises are a duplex with a single utility meter.

144.   Defendant Kevin Christ charged Ms. Watson for "excessive electrical usage" and "excessive water usage" during Ms. Watson's tenancy at the Fremont premises. Exs. 8 & 9.

145.   Defendants billed Ms. Watson for utility charges in violation of MINN. STAT. § 504B.215.

146.   Defendants did not provide Ms. Watson with any of the notices, lease provisions, or other writings required under the shared meter statute. MINN. STAT. § 504B.215, subdiv. 2a (2012).

147.   Defendants' failure to comply with the single meter utility billing requirements of MINN. STAT. § 504B.215 violated Minn. Stat. §§ 504B.161, subdiv. 1, cl. (1), and 504B.221.

### Sixth Cause of Action: Violation of the Minnesota Uniform Deceptive Trade Practices Act, MINN. STAT. §§ 325.43-.48

148.   Paragraphs 1 through 88 are incorporated herein by this reference.

149.   Paragraphs 118 through 128 are incorporated herein by this reference.

150.   Paragraphs 135 through 140 are incorporated herein by this reference.

151. Paragraphs 142 through 147 are incorporated herein by this reference.

152. Defendant Kevin Christ and Ms. Watson signed a two page lease on August 9, 2010. Ex. 1.

153. On August 9, 2010, Defendant Kevin Christ faxed a copy of the two page lease Ms. Watson signed to Metro HRA. Attached to the lease submitted by Defendant Kevin Christ was a three page, 11 paragraph "Addenda to Lease." Ex. 3.

154. Defendants never presented Ms. Watson with the "Addenda to Lease."

155. Defendants never told Ms. Watson about the existence of, or the contents of the "Addenda to Lease."

156. The "Addenda to Lease' materially altered the terms of the parties' rental agreement. Ex. 3.

157. The "Addenda to Lease" contained a number of provisions that directly violated Minnesota Landlord-Tenant law. Ex. 3.

158. Defendants violated the Minnesota Uniform Deceptive Trade Practices Act, MINN. STAT. §§ 325D.43-.48 (2012), when they failed to show Ms. Watson the "Addenda to Lease," when they billed Ms. Watson for utility charges separate from rent in violation of the HAP contract and in violation of Minnesota Landlord-Tenant law, and when they in bad faith withheld the return of Ms. Watson's security deposit.

### RELIEF

WHEREFORE, Plaintiff Pamela Watson and the United States of America respectfully request the following relief:

1. Find that Defendants violated the False Claims Act, 31 U.S.C. § 3729

24

(2013), and are liable to the United States of America;

2.    Find that Defendants violated the Minnesota Human Rights Act. MINN. STAT. chapter §§ 343A.09, subdivs. 1(a), (b); 363A.15 (2012);

3.    Find that Defendants violated the Minnesota Landlord-Tenant statute. MINN. STAT. §§ 504B.161; 504B.178; 504B.215 (2012);

4.    Assess a civil penalty between $5,500 and $11,000 pursuant to 42 U.S.C. § 3729 (a) (2013) against the Defendants for each separate violation of the False Claims Act;

5.    Award the United States, pursuant to 42 U.S.C. § 3729 (a) (2013), the damages that it sustained as a result of the Defendants' acts;

6.    Award Ms. Watson the qui tam Plaintiff's share of the proceeds or settlement pursuant to 31 U.S.C. § 3730(d) (2013);

7.    Award Ms. Watson punitive and compensatory damages as allowed under MINN. STAT. § 504B.178, subdivs. 2 and 7 (2012);

8.    Award Ms. Watson treble damages or $500, whichever is greater, under MINN. STAT. §§ 504B.215, subdivs. 2 and 2a, and 504B.221 (2012);

9.    Declare, pursuant to MINN. STAT. § 555 (2012), that Defendants' lease provisions and billing practices regarding lawn care, snow and ice removal, rodent and pest control, excessive water usage, and excessive electrical usage violate MINN. STAT. § 352D.43-.48 (2012);

10.    Enjoin, pursuant to MINN. STAT. § 555 (2012), Defendants from including and enforcing those lease provisions and billing practices regarding lawn care, snow and

ice removal, rodent and pest control, excessive water usage, and excessive electrical usage which violate MINN. STAT. §§ 352D.43-.48 (2012) in any rental agreements in Minnesota;

11.    Award costs and reasonable attorney's fees to the United States pursuant to 31 U.S.C. § 3730 (d) (2013);

12.    Award costs and reasonable attorneys' fees to Ms. Watson pursuant to 31 U.S.C. § 3730 (d) (2013);

13.    Award costs and reasonable attorney's fees to Ms. Watson pursuant to MINN. STAT. § 363A.33, subdiv. 7 (2012);

14.    Award reasonable attorney's fees to Ms. Watson pursuant to MINN. STAT. §§ 504B.215, subdivs. 2 and 2a, and 504B.221 (2012);

15.    Award costs and attorney's fees to Ms. Watson pursuant to MINN. STAT. § 325D.45, subdiv. 2. (2012);

16.    Award costs to Ms. Watson pursuant to MINN. STAT. § 555.10 (2012); and

17.    Such other relief as the court finds just and appropriate.

MID-MINNESOTA LEGAL AID

Dated: 8/12/13 , 2013

By _____
James H. Clark, Attorney ID No. 0393590
Dorinda L. Wider, Attorney ID No. 162334
Attorneys for Plaintiff Pamela L. Watson
430 First Avenue North, Suite 300
Minneapolis, MN 55401-1780
Telephone and Facsimile:   (612) 746-3624
jclark@mylegalaid.org